J-S41011-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                     :                PENNSYLVANIA
                     :
            v.           :
                     :
                     :
BRIAN DAVIS               :
                     :
           Appellant    :   No. 2373 EDA 2017

Appeal from the Judgment of Sentence June 16, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0004931-2016

BEFORE:   GANTMAN, P.J., OLSON, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:           **FILED JULY 25, 2018**

Appellant, Brian Davis, appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following his conviction on the charges of aggravated assault, possession of an instrument of crime, simple assault, and recklessly endangering another person.[1] After a careful review, we affirm.

The relevant facts and procedural history are as follows: Appellant was arrested, and represented by counsel, he proceeded to a bench trial on April 10, 2017. At trial, Police Officer Matthew Conaway testified that he and his partner were at the Einstein Hospital on May 4, 2016, to "sit on a prisoner" when, at approximately 4:30 p.m., a nurse "flagged [them] down and said

_____

[1] 18 Pa.C.S.A. §§ 2702(a), 907(a), 2701(a), and 2705, respectively.

_____

*   Former Justice specially assigned to the Superior Court.

that there was a stabbing" victim who had just arrived at the hospital. N.T., 4/10/17, at 14. Officer Conaway approached the male victim, who was lying on a stretcher, and attempted to get information about the stabbing. *Id.* at 14-15. The victim, later identified as Ronald Lane, indicated he was stabbed at 5115 Keyser Street, and Officer Conaway radioed the information to the police station. *Id.* at 16.

Police Officer Joshua Daniels testified that he and his partner were on patrol on May 4, 2016, when they received information via the police radio indicating there had been a stabbing at 5115 Keyser Street. *Id.* at 19. Officer Daniels and his partner proceeded to 5115 Keyser Street where Velda Jackson and Remous Lane met them. *Id.* at 19-20. The individuals reported to Officer Daniels that Appellant had stabbed their family member, Ronald Lane, who was at the hospital. *Id.* at 21. Officer Daniels observed blood on the street, sidewalk, and up the front steps of the property. *Id.* After being invited inside of the residence, Officer Daniels observed a trail of blood going up the stairs and into the second floor bathroom. *Id.* at 21-22.

Officer Daniels received information that Appellant had received an eye wound during the incident, and thus, he proceeded to check for Appellant at area hospitals. *Id.* at 22-23. Officer Daniels discovered Appellant, who was receiving treatment for an eye injury, at Temple Hospital. *Id.* at 23. Appellant informed Officer Daniels "that he had been in an altercation with [Ronald Lane], [and] that he had been punched in the face several times." *Id.* at 24.

While Officer Daniels spoke with Appellant, he noticed blood on Appellant's pants and hands. *Id.*

After Appellant received medical treatment, Officer Daniels arrested him and transported him to the police station. Officer Daniels testified that, during the transport:

> [Appellant] was in the backseat just muttering under his breath, and [he] happened to hear him say the words, I'm guilty, some other phrases, and then the only other [statement he] remember[s] is [Appellant] also saying that I'm responsible[.]

*Id.* at 26.

Officer Daniels characterized Appellant's demeanor as "a deflated state, kind of down, mopey. . .and just kind of blurted [the statements] out." *Id.*

On cross-examination, Officer Daniels clarified that he and his partner responded to 5115 Keyser Street because of the information provided by their fellow officers and there is no indication any citizen called 911 with regard to the subject incident. *Id.* at 29. Officer Daniels indicated Appellant did not resist arrest, and the officer's search of Appellant's person incident to the arrest revealed no contraband. *Id.* at 32.

Ronald Lane testified that, on May 4, 2016, he resided in a halfway house; however, his mother (Velda Jackson), his brother (Remous Lane), and his mother's boyfriend (Appellant) resided at 5115 Keyser Street. *Id.* at 34-35. Mr. Lane testified as follows regarding his visit with his family at their residence on May 4, 2016:

[ADA]: Could you please tell us what happened to you?

- 3 -

[MR. LANE]: We got into an altercation, and I got stabbed.

[ADA]: Who did you get into an altercation with?

[MR. LANE]: [Appellant].

[ADA]: When you say you got stabbed, who stabbed you?

[MR. LANE]: [Appellant].

[ADA]: Can you describe what the altercation was over?  Why were you guys fighting?

[MR. LANE]: Something he said to my mom.

THE COURT: You have to speak in the mic so we can hear.

[MR. LANE]: Something that he said to my mother that I did not agree with.

[ADA]: Do you remember what that was?

[MR. LANE]: Not exactly, no.

[ADA]: Do you remember where you were when he said—well, I'm sorry.  Let me rephrase that.

Where were you when you were stabbed, where in the house were you?

[MR. LANE]: In the hallway upstairs.

[ADA]: It's a two-story house?

[MR. LANE]: Yes.

[ADA]: And what rooms are upstairs?

[MR. LANE]: Three bedrooms and a bathroom.

\*\*\*

[ADA]: So when this altercation began, did it begin as a verbal argument?

[MR. LANE]: Yes.

[ADA]: And where did that verbal argument take place, where in the house?

[MR. LANE]: The bedroom, my mom's bedroom.

[ADA]: And that's upstairs?

[MR. LANE]: Yes.

[ADA]: Who was in there when that argument started?

[MR. LANE]: Just me and him.

[ADA]: Where had your mom gone?

[MR. LANE]: Downstairs.

[ADA]: So he said something to your mom, she goes downstairs, and then you argue with him?

[MR. LANE]: Yes.

[ADA]: How long did that argument last before it turned physical?

[MR. LANE]: A minute or two.

[ADA]: And do you remember what the first thing that happened was that made it turn physical?'

[MR. LANE]: Just the fact of what he said to my mom.

[ADA]: I guess what I mean is, did somebody punch someone or did someone push someone?  Do you remember what happened?

[MR. LANE]: It happened so fast, like….

[ADA]: Okay.  Do you remember getting hit by [Appellant]?

[MR. LANE]: Hit?

[ADA]: Sorry?

[MR. LANE]: You said did I ever get hit by him?

[ADA]: Yeah.  Did he hit you?

[MR. LANE]: No.

[ADA]: Did you hit him?

[MR. LANE]: Yes.

[ADA]: Do you remember where you hit him?

[MR. LANE]: Probably in his jaw.

[ADA]: And do you remember how many times?

[MR. LANE]: Three, four.

[ADA]: Was he standing the whole time that you were hitting him?

[MR. LANE]: No. No. He might have for the first one, though.

[ADA]: For the first one?

[MR. LANE]: He was standing, but after that he wasn't.

[ADA]: Okay. What happened?  Did he fall?

[MR. LANE]: Yeah.

[ADA]: And after he fell, you said you punched him a couple more times, and then what happened after that?

[MR. LANE]: My mom and my brother came and broke it up, was breaking it up.

[ADA]: Who was doing what to break it up?

[MR. LANE]: Well, they went to grab me. You know, like separating us like that.

[ADA]: And when they separated you, how far away were you from each other?

[MR. LANE]: Like three feet.

[ADA]: Where are you at this point, still in the bedroom?

[MR. LANE]: I'm still in the bedroom. The door is to my right. I'm still in the bedroom. He's like, by the dresser. I'm by the other dresser. They're like, this far apart.

[ADA]: Okay. Indicating for the record---

[MR. LANE]: Four feet.

[ADA]:--four feet.

[MR. LANE]: They're, like, side by side. The door separates them.

[ADA]: Is anybody holding him back?

[MR. LANE]: No, not really.

[ADA]: So nobody is holding anyone back, you're just separated at this point?

[MR. LANE]: Yeah, my mom is in the middle of us. My brother and mom was in the middle of us.

[ADA]: And what happened after that?

[MR. LANE]: We go in the hallway, then he comes out in the hallway. He told my mom to move out [of] the way and he stabbed me.

[ADA]: And where did he stab you?

[MR. LANE]: In my lung.

[ADA]: Do you remember how many times he stabbed you?

[MR. LANE]: Just once.

[ADA]: And do you remember what he stabbed you with?

[MR. LANE]: No, that I don't know.

[ADA]: Do you remember what you told the police you were stabbed with?

[MR. LANE]: I didn't make no police report.

*** 

[ADA]: Do you remember going into the bathroom at all?

[MR. LANE]: Yeah, we was in the bathroom.

[ADA]: When did you go into the bathroom?

[MR. LANE]: It happened so quick. I hit him again. That's how we wind [*sic*] up on the bathroom floor. He swung at me again. That's how he got to my nose.

[ADA]: He swung at you again?

[MR. LANE]: Yeah.

[ADA]: This is in the bathroom?

[MR. LANE]: Yeah. I was going forward. And then I grabbed his hand and I went to go punch him, but I never caught a breath. And that's when I got off him and trying to catch my breath. But my lung had collapsed by then.

[ADA]: You said that he swung at your nose. Did he cut your nose?

[MR. LANE]: Right here.

[ADA]: That scar that you have right now on your nose, that's from him cutting you? You have to say yes, sir, for the record.

[MR. LANE]: Yes.

[ADA]: So how long after the first time he stabbed you did this happen in the bathroom?

[MR. LANE]: Not even a minute afterwards. Like, everything just, like, happened so fast, like….

[ADA]: But you were in the bathroom first and then he came in after you or how did it happen?

[MR. LANE]: The way it was, I didn't know I was stabbed first. My reaction was just hit him, and he fell in the bathroom. So it was all like from the bedroom to the hallway to the bathroom to me downstairs and then the hospital, just like that.

*** 

[ADA]: Mr. Lane, when [Appellant] stabbed you were you punching him?

[MR. LANE]: No.

[ADA]: What were you doing?

[MR. LANE]: I backed up. My mom was in between, so I backed up.

*Id.* at 36-41, 44-45, 60.

Mr. Lane indicated that, after he was stabbed, he walked outside, where his cousin was "just pulling up." *Id.* at 41-42. His cousin drove him to the hospital, where he received a chest tube. *Id.* at 42-43.

Mr. Lane denied being "high" or "drunk" at the time of the incident, and he testified that he clearly remembers what occurred. *Id.* at 46.

Detective Justin Falcone testified he interviewed Mr. Lane at the hospital on May 4, 2016. *Id.* at 64-65. Mr. Lane was "upset, but otherwise, he was very competent and able to speak." *Id.* at 66. Detective Falcone detected no evidence that Mr. Lane was "under the influence" of drugs or alcohol at this time. *Id.* at 67.

With regard to the incident, Mr. Lane made the following statement to Detective Falcone:

> My mother's boyfriend, [Appellant], was arguing with my mother over money. I asked him to calm down and he was preparing to do something. He was, like, gesturing back and forth like he was going to hit me and we started going at it. And my mom and my brother got in between us to break up the fight, and this P word stabbed me.

*Id.* at 70.

Detective Falcone testified he asked Mr. Lane if he knew the type of item Appellant used to stab him, and Mr. Lane answered: "Some makeshift thing

- 8 -

he has. I don't know exactly. I think he stabbed me once or twice. Maybe like an ice pick or something." *Id.* at 71.

Detective Keary Sellers testified that she executed a search warrant on the house at issue searching for the weapon used in the stabbing. *Id.* at 72-73. She indicated the weapon had been described to her as "some kind of homemade ice pick or screwdriver with a black handle or tape around the handle." *Id.* at 73. She recovered a screwdriver with a black handle; however, the screwdriver did not have any blood on it. *Id.*

The parties stipulated that hospital records revealed Mr. Lane had a stab wound to his chest, for which he received a chest tube, as well as a laceration to his face.

Appellant testified that, on the day in question, he was in the bedroom arguing with his fiancée, Velda Jackson, about money when Mr. Lane appeared and told Ms. Jackson to go downstairs. *Id.* at 94. Mr. Lane then asked Appellant, "when you gonna pay my mom?" *Id.* Appellant indicated that Mr. Lane "sucker-punched [him]," causing his right eye to bleed; Appellant noted that he is blind in his left eye. *Id.* at 95. Appellant testified that he fell down, and Mr. Lane began "beating on" him to the extent Ms. Jackson and Mr. Lane's brother yelled for him to stop. *Id.* at 96.

Appellant testified that Ms. Jackson and Mr. Lane's brother pulled Mr. Lane into the hallway and the following occurred:

> I said, oh, no, he didn't. Then I heard him holler, move, move, let me go, get off me, get off me. I went, oh, he coming

- 9 -

back in here. So the only thing I could do, I seen a screwdriver. So I went up there, like, what's up? He's like, move, and he started screaming at me again. So I guess by all of that, I took a—I swung and stabbed him one time. And then a couple of them grabbed me, tried to grab the screwdriver out of my hand. We all fell to the bathroom on the floor. There's three people on top of me. I was on the bottom. And I kept saying, get off me, I can't breathe, because somebody had their knee on me.

[Mr. Lane] said, as he got off me, they got the thing out of my hand, and [Mr. Lane] was like, I can't breathe. And I'm in there bleeding. That's why the pictures show all of the blood in the bathroom.

*Id.* at 97.

Appellant testified that he told the police that Mr. Lane hit him first. *Id.* at 98. Appellant testified that, after he was released on bail in connection with the current incident, he went back to the house, where Mr. Lane "cracked [him] in the head with a piece of wood, gave [him] staples, and stitches on the side of [his] head, and then punched [him] in [the] mouth in front of the ambulance dude on the way coming out the door." *Id.* at 99. Appellant indicated that he did not "press charges" or call the police. *Id.*

At the conclusion of all testimony, the trial court convicted Appellant of the offenses indicated *supra*, and on June 16, 2017, Appellant proceeded with counsel to a sentencing hearing, at which the trial court sentenced Appellant to an aggregate of three years to six years in prison, to be followed by five years of probation.

On June 20, 2017, Appellant filed a counseled post-sentence motion seeking a judgment of acquittal, a new trial, or modification of his sentence.

Specifically, Appellant challenged the sufficiency of the evidence, claimed the verdict was against the weight of the evidence, and averred his sentence was unduly harsh. The trial court denied Appellant's post-sentence motion, and this timely, counseled appeal followed. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement, and Appellant timely complied.[2] The trial court did not file a responsive Pa.R.A.P. 1925(a) opinion as the trial judge was no longer sitting on the bench.

On appeal, Appellant's sole claim is that the trial court's verdict is contrary to the weight of the evidence such that he is entitled to a new trial. Specifically, Appellant contends the weight of the credible evidence reveals Appellant stabbed Mr. Lane in self-defense. Appellant avers that, "[t]o the extent there is any incongruence between the testimony of [Appellant] and [Mr.] Lane, the testimony of [Appellant] possesses the greater weight when one views their testimony in light of all the other evidence presented at trial." Appellant's Brief at 28. For instance, Appellant avers Mr. Lane's trial testimony was not credible since he falsely informed the police that he lived at the home in question, as well as failed to inform the police that he lived at a halfway house, he was on parole, or he threw the first punch. *Id.* at 28. Appellant concludes that, "when viewed in light of the fact that [Mr. Lane] provided false and intentionally misleading information to police on a prior occasion

---

[2] Appellant raised therein his weight of the evidence claim, which he also raises on appeal.

- 11 -

regarding the incident at issue, it is beyond peradventure that the testimony of [Appellant] is of greater force." *Id.* at 29. Further, Appellant posits Mr. Lane's trial testimony should be discredited since he "regularly used cocaine[,]" "drank approximately eight ounces of vodka two days per week[,]" and was a convicted felon. *Id.* at 28-29. Thus, Appellant avers that, to the extent the trial court relied on Mr. Lane's unreliable testimony in finding Appellant guilty, the verdict was against the weight of the evidence.

Our standard of review is as follows:

> The decision to grant or deny a motion for a new trial based upon a claim that the verdict is against the weight of the evidence is within the sound discretion of the trial court. Thus, the function of an appellate court on appeal is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence. An appellate court may not overturn the trial court's decision unless the trial court palpably abused its discretion in ruling on the weight claim. Further, in reviewing a challenge to the weight of the evidence, a verdict will be overturned only if it is so contrary to the evidence as to shock one's sense of justice.

> A trial court's determination that a verdict was not against the interest of justice is one of the least assailable reasons for denying a new trial. A verdict is against the weight of the evidence where certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. We do not reach the underlying question of whether the verdict was, in fact, against the weight of the evidence. . . Instead, this Court determines whether the trial court abused its discretion in reaching whatever decision it made on the motion.

*Commonwealth v. Williams*, 176 A.3d 298, 312 (Pa Super. 2017) (internal citations, quotations, and brackets omitted). It is well-settled that, as it relates to the credibility of the witnesses, such is "exclusively for the finder of

fact who is free to believe all, part, or none of the evidence." ***Commonwealth v. Devine***, 26 A.3d 1139, 1146 (Pa.Super. 2011).

"[A] true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." ***Commonwealth v. Thompson***, 106 A.3d 742, 758 (Pa.Super. 2014). For that reason, the trial court need not view the evidence in the light most favorable to the verdict winner, and may instead use its discretion in concluding whether the verdict was against the weight of the evidence. ***Commonwealth v. Widmer***, 560 Pa. 308, 744 A.2d 745, 751 n.3 (2000).

Here, in finding Appellant guilty of the offenses beyond a reasonable doubt, the trial court found the Commonwealth's witnesses, including Mr. Lane, to be credible and reconciled any discrepancies in the witnesses' testimony. Additionally, our review discloses that Mr. Lane was subject to extensive cross-examination before the trial court regarding where he lived, his parole status, and his use of cocaine and alcohol, as well as his failure to inform the police that he threw the first punch. Further, Mr. Lane was subject to extensive cross-examination regarding the altercation at issue. The trial court had a full opportunity to observe Mr. Lane, as well as Appellant, and to assess their credibility regarding the events, which undisputedly led to Appellant stabbing Mr. Lane. After reviewing all the evidence, the trial court found that the credible evidence revealed Appellant committed the instant offenses and the Commonwealth disproved his claim of self-defense.

In forwarding his weight of the evidence claim, Appellant essentially asks us to reassess the credibility of the witnesses and reweigh the testimony and evidence presented at trial. We cannot and will not do so. Our review of the record shows that the evidence is not tenuous, vague, or uncertain, and the verdict was not so contrary to the evidence as to shock the court's conscience. Thus, the trial court properly exercised its discretion in concluding that the verdict was not against the weight of the evidence, and therefore, Appellant is not entitled to relief on his weight claim.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/25/18